The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On all relevant dates, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On all relevant dates, an employee-employer relationship existed between plaintiff and defendant-employer.
3. On all relevant dates, defendant-employer was self-insured and Hewitt Coleman Associates, Inc. served as third-party administrator.
4. On February 16, 2006, plaintiff sustained a compensable injury by accident to his right knee when a stack of plastic boxes fell and struck his leg. Defendant accepted the claim on an Industrial Commission Form 60 dated May 30, 2006.
5. As a direct result of the compensable injury, on May 22, 2006, plaintiff underwent a right knee arthroscopy with medial and lateral meniscectomies. Defendant paid plaintiff temporary total disability compensation from May 25, 2006 to May 31, 2006.
6. On October 12, 2006, plaintiff underwent a total right knee replacement. Plaintiff has not worked since the knee replacement surgery. Defendant denies that the knee replacement surgery is causally related to the knee injury plaintiff sustained on February 16, 2006.
7. On all relevant dates, plaintiff's average weekly wage was $355.10, which yields a compensation rate of $236.73 per week.
8. The following documents were admitted into evidence at the Deputy Commissioner's hearing:
 a. A Pre-Trial Agreement, marked as Stipulated Exhibit (1). *Page 3 
 b. A packet of various stipulated exhibits, marked as Stipulated Exhibit (2), and which included the following:
 1) Industrial Commission forms,
 2) Medical records,
 3) Plaintiff's responses to defendant's first set of interrogatories,
 4) Plaintiff's supplemental responses to defendant's first set of interrogatories,
 5) Defendant's responses to plaintiff's first set of interrogatories and request for production of documents, and
 6) A general laborer job description.
9. The issues before the Full Commission are whether plaintiff's right knee replacement surgery and resulting disability are causally related to his injury by accident on February 16, 2006; and, what indemnity and medical compensation, if any, plaintiff is entitled to receive as a result of his injury by accident.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of his deposition, plaintiff was 64 years old. Plaintiff's has an eighth grade education.
2. Prior to his employment with defendant-employer, plaintiff worked as a delivery man for a construction business. Plaintiff has also worked as a farmer.
3. Plaintiff began working for defendant-employer at its Sleepy Creek Turkey *Page 4 
Hatchery in 1973 as a laborer. Defendant-employer brings in turkey eggs from breeder farms and incubates them until hatched, then the poults are transported to farms. Plaintiff's initial job for defendant-employer involved transporting turkey eggs. For approximately ten years prior to his injury by accident, plaintiff performed general maintenance in and around Hatchery No. 1. Plaintiff's job duties involved cleaning the hatchery, washing buckets and taking out the garbage. Plaintiff was regularly required to lift as much as 50 pounds and was on his feet throughout the workday. This job was classified by the testifying experts as a medium-duty, unskilled position.
4. Prior to his injury by accident, plaintiff decided to fully retire at the age of 65. As of February 16, 2006, plaintiff was working a reduced schedule of approximately 32 hours per week since he was also receiving Social Security benefits.
5. Prior to February 16, 2006, plaintiff had not experienced any pain, stiffness, or swelling in his right knee.
6. On February 16, 2006, a stack of plastic boxes fell and struck plaintiff's leg. Plaintiff testified that the boxes were typically stacked in groups of 22, that each tray weighed 7.87 pounds, and that the stack weighed as much as 172 pounds. However, plaintiff later testified that the stack of boxes weighed 25 pounds.
7. Following his admittedly compensable right knee injury by accident, plaintiff first sought medical treatment at Immediate Care of Goldsboro. Thereafter, plaintiff was referred to Goldsboro Orthopaedic Associates and Dr. William de Araujo.
8. Plaintiff was first examined by Dr. de Araujo on February 27, 2006. Dr. de Araujo diagnosed plaintiff with a right knee sprain and prescribed Naprosyn. Dr. de Araujo also encouraged plaintiff to discontinue use of the knee brace and walker. He assigned plaintiff work restrictions of no standing more than 30 minutes and no lifting more than 25 pounds. Dr. de *Page 5 
Araujo later changed plaintiff's work restrictions to no standing over two hours and no repetitive lifting more than 25 pounds.
9. On March 20, 2006, plaintiff returned to Dr. de Araujo and reported persistent pain and deteriorating function in his right knee. Plaintiff received a right knee steroid injection and was referred for an MRI. The MRI revealed high-grade medial compartment osteoarthritis in the femur and tibia with developing osteonecrosis, as well as degenerative fraying of the medial meniscus, an anterior knee effusion and posteromedial Baker's cyst. It was also noted that plaintiff had no evidence of any ligamentous instability. Plaintiff was scheduled for surgery.
10. Brenda G. Morawski was defendant-employer's human resources administrator at the time of plaintiff's February 16, 2006 injury. In response to Ms. Morawski's inquiry regarding his treatment recommendations, Dr. de Araujo noted on May 2, 2006 that it was his opinion that plaintiff had degenerative fraying of his right meniscus, which could be related to his February 16, 2006 injury. Additionally, Dr. de Araujo noted that plaintiff has high grade osteoarthritis, which was not related to his workplace injury. Finally, Dr. de Araujo opined that if plaintiff had a large amount of articular damage, he might have to consider a knee replacement, but that this would not be attributable to his February 16, 2006 injury.
11. On May 22, 2006, plaintiff underwent a right knee arthroscopy for his right knee conditions. As a result of this procedure, Dr. de Araujo was able to give a more precise diagnosis of tricompartmental arthritis with tears of the medial and lateral menisci. During the procedure, Dr. deAraujo performed medial and lateral meniscectomies, as well as a tricompartmental chondroplasty with coblation of unstable cartilage fragments.
12. On May 30, 2006, Dr. de Araujo noted that plaintiff could return to work with restrictions of no prolonged standing more than 30 minutes and infrequent driving, stooping and *Page 6 
bending. Dr. de Araujo's records from that date reflect that plaintiff understood that his long term arthritis could require further surgery and that this surgery would not be covered under workers' compensation.
13. Following his initial right knee surgery, plaintiff returned to a transitional, light-duty position constructing cardboard boxes. When performing this job, plaintiff placed the broken down boxes and dividers on a table approximately five feet long. A chair was available for plaintiff to sit as needed so he could get a box, fold it, make the box, set it to the side, and repeat the job. This light duty position is not a permanent, full-time job at defendant-employer's facility. Defendant-employer does not hire employees to only construct boxes and does not advertise such a position. Plaintiff remained in this position until October 11, 2006, the day prior to his knee replacement surgery.
14. On July 26, 2006, plaintiff returned to Dr. de Araujo with ongoing severe pain. Dr. de Araujo noted that plaintiff had a failed arthroscopic debridement and recommended a total knee replacement as a long term solution. On October 12, 2006, plaintiff underwent a total right knee replacement which was paid by his group health insurance.
15. Following his knee replacement, plaintiff underwent physical therapy. Although plaintiff attended the sessions and gave his best effort, he was not able to meet his range of motion goals and could not fully bend or straighten his knee.
16. On February 8, 2007, plaintiff underwent manipulation under anesthesia to break up the scar tissue that developed after the knee replacement surgery.
17. On June 28, 2007, Dr. de Araujo assigned plaintiff restrictions of sedentary work with avoiding any repetitive stair climbing, kneeling, squatting, and any significant heavy lifting on a repetitive basis. *Page 7 
18. Dr. de Araujo stated that plaintiff reached maximum medical improvement on February 28, 2008. Plaintiff's total permanent partial disability rating was be between 35% and 40%, of which 15% was for his acute injury, in addition to his chronic conditions.
19. At the time of the Deputy Commissioner's hearing, plaintiff did not have full flexion or extension of his right knee and continued to experience pain and swelling. Additionally, plaintiff continued to walk with a limp, used a cane for ambulation and continually needed to change positions because of pain and stiffness in his right knee.
20. Although as of May 2, 2006, it was Dr. de Araujo's opinion that plaintiff's potential need for a knee replacement would not be attributable to his injury by accident, at his deposition, Dr. de Araujo testified to a reasonable degree of medical probability that the knee replacement procedure he performed was causally related to plaintiff's February 16, 2006 right knee injury. Dr. de Araujo testified,
 . . . I believe his accident caused his meniscal injuries. He had arthroscopy to treat those meniscal injuries, but he never returned to his pre-injury activity level. So then I believe that that injury accelerated his arthritis, which ultimately led to his knee replacement. So the injury did not cause his arthritis, but the injury indirectly led to him needing a knee replacement and it's probably some sort of a compilation of all those things.
21. Dr. de Araujo explained that although plaintiff's arthritis and osteonecrosis conditions were chronic and predated the knee injury, the injury aggravated and accelerated these conditions and caused plaintiff's severe pain and that the total knee replacement was performed because of this ongoing severe pain. Dr. de Araujo felt this causal relationship was true even though plaintiff might have needed a knee replacement surgery some time in the future.
22 The greater weight of the evidence shows and the Commission finds that plaintiff's February 16, 2006 injury by accident materially aggravated and accelerated his pre- *Page 8 
existing right knee arthritis and osteonecrosis. This aggravation resulted in medically necessary right knee replacement surgery on October 12, 2006, which directly caused the need for the February 8, 2008 right knee manipulation.
23. Following plaintiff's October 16, 2006, total right knee replacement, defendant-employer offered plaintiff the transitional light duty job he previously performed constructing boxes. Dr. de Araujo opined that from a physical standpoint, plaintiff could perform this job. 24. The Commission finds that the light duty box construction job offered to plaintiff was not a job that is ordinarily available in the competitive job market and was therefore not suitable employment. Thus, plaintiff's refusal of the light duty box construction job after October 12, 2006 was justified.
25. On January 15, 2008, prior to plaintiff's deposition testimony, counsel for plaintiff wrote to defendant-employer informing them of plaintiff's decision to retire and that this decision was based on the fact that he was unable to perform his regular job as a maintenance worker.
26. After Dr. de Araujo was deposed and prior to the close of the evidentiary record before the Deputy Commissioner, on July 14, 2008, defendant-employer offered plaintiff the poult room position. According to the job analysis performed by rehabilitation counselor Kim Deal, the poult room position required lifting 23-25 pound poult boxes. Although the carrying requirement was an essential part of the job duties according to manager James Campbell, defendant-employer modified the position so that plaintiff was not required to transfer the boxes.
27. The Commission finds that the poult room position offered to plaintiff was so modified to accommodate plaintiff's restrictions that it would not be available in the competitive labor market and there is no evidence that defendant-employer or any other employer would hire *Page 9 
plaintiff for this position. Therefore, plaintiff's refusal of the modified poult room position after July 14, 2008 was justified.
28. Although plaintiff completed the eighth grade, vocational assessment and transferrable skills analysis tests administered on February 1, 2008 by Ms. Deal indicate that plaintiff functions at a second grade level for reading, a first grade level for spelling, and a third grade level for arithmetic. Due to a lack of writing skills, plaintiff could not complete a sample employment application for Ms. Deal. Based upon her evaluation, Ms. Deal recommended that plaintiff complete a situational work assessment, which provides more detailed information when working with someone functioning at a lower level. Ms. Deal also recommended a work adjustment program or structured workshop.
29. Vocational tests administered by Kim Engler, vocational expert, indicate that plaintiff has memory and concentration difficulties and, therefore, has difficulty learning and carrying out simple instructions. Ms. Engler opined that based upon his age, education, work history, need to walk with an assistive device, and cognitive difficulties, plaintiff is unable to perform even unskilled, sedentary work and has lost access to the labor market.
30. Although there is some evidence that plaintiff is capable of sedentary employment, the Commission finds that it would be futile for plaintiff to look for work because of his age, his limited education in that he is functionally illiterate, his work experience primarily in medium level work, and his physical limitations. Based upon the credible vocational and medical evidence of record, and as a result of his February 16, 2006 injury by accident, the Commission further finds that plaintiff has been unable to earn any wages in his former position with defendant-employer or in any other employment for the period October 12, 2006 through the present and continuing. *Page 10 
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On February 16, 2006, plaintiff sustained an admittedly compensable injury by accident to his right knee arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. In a claim for additional compensation for medical treatment, the treatment must be "directly related to the original compensable injury."Pittman v. Thomas Howard, 122 N.C. App. 124, 130, 468 S.E.2d 283, 286,disc. review denied, 343 N.C. 513, 471 S.E.2d 18 (1996). It is the burden of the injured worker to prove that the injury or condition being treated is causally related to the compensable injury by accident.Snead v. Mills, Inc., 8 N.C. App. 447, 174 S.E.2d 699 (1970). The North Carolina Court of Appeals stated in Parsons v. Pantry, Inc.,126 N.C. App. 540,485 S.E.2d 867 (1997) that once the Commission has found a claim compensable, a rebuttable presumption arises that the treatment is directly related to the original compensable injury. The burden then shifts to defendant to prove that the medical treatment is not directly related to the compensable injury. Id. In Reinninger v. PrestigeFabricators, Inc., 136 N.C. App. 225, 523 S.E.2d 720 (1999), the Court of Appeals applied the Parsons presumption to a case in which the parties entered into a Form 21 Agreement for Compensation which was approved by the Commission and therefore constituted an "award" of the Commission, pursuant to N.C. Gen. Stat. § 97-82. The Court of Appeals has also held that an employer's payment of compensation pursuant to a Form 60, as in the case before us, is an award of the Commission and *Page 11 
that the Parsons presumption applies. Perez v. American Airlines,174 N.C. App. 128, 620 S.E.2d 288 (2005), disc. review improvidentlyallowed, 360 N.C. 587, 634 S.E.2d 887 (2006).
3. In this case, defendant accepted plaintiff's right knee injury on February 16, 2006 as compensable. As such, the Parsons presumption applies and defendant failed to rebut the presumption that the medical treatment for plaintiff's right knee replacement and manipulation are directly related to the compensable injury. Parsons v. Pantry, Inc.,supra. The greater weight of the medical evidence establishes that plaintiff's right knee replacement and manipulation are directly and causally related to his injury by accident on February 16, 2006.
4. Plaintiff's February 16, 2006 injury by accident materially aggravated and accelerated his pre-existing right knee arthritis and osteonecrosis, resulting in a right knee replacement on October 12, 2006, which directly caused the need for the February 8, 2008 right knee manipulation procedure. N.C. Gen. Stat. § 97-2(6).
5. Because the light duty box construction job and the modified poult room position offered to plaintiff by defendant-employer are not positions ordinarily available in the competitive job market, the jobs were not suitable and plaintiff's refusal was justified. N.C. Gen. Stat. § 97-32; Saums v. Raleigh Community Hosp., 346 N.C. 760, 764-765,487 S.E.2d 747, 750 (1997); Peoples v. Cone Mills Corporation, 316 N.C. 426,437, 342 S.E.2d 798, 805 (1986).
6. Defendants admitted the compensability of plaintiff's injury by accident on October 3, 2000 by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v.Charmes/Arby's Roast Beef, 142 N.C. App. 154, 542 S.E.2d 277, disc.review denied, 353 N.C. 729, 550 S.E.2d 782 (2001).
7. In order to meet the burden of proving disability, plaintiff must prove that he was *Page 12 
incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms., Inc., supra.
8. In this case, Dr. de Araujo released plaintiff to sedentary work with lifting restrictions. However, even though plaintiff may be capable of some work, he has shown that after October 12, 2006, it was futile for him to seek employment because of his advanced age, very limited education, work experience only in medium level work, and his physical limitations, including his inability to straighten his right leg and the necessity of walking with a cane. Thus, plaintiff met his initial burden to show that he is disabled. Plaintiff was unable due to his compensable injury to return to his regular job with defendant-employer or to any other employment. *Page 13 
9. Defendant has not shown that suitable jobs are available for plaintiff and that plaintiff is capable of obtaining a suitable job, taking into account plaintiff's physical, mental and vocational limitations. Demery v. Perdue Farms, Inc., supra; Russell v. LowesProduct Distribution, supra.
10. As a result of his compensable injury, plaintiff is entitled to payment by defendant of total disability compensation at the rate of $236.73 per week beginning October 12, 2006 and continuing until plaintiff returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
11. As the result of his compensable injury, plaintiff sustained a 15% permanent functional impairment to his right leg. N.C. Gen. Stat. § 97-31(15).
12. Plaintiff is entitled to payment by defendant for all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability, including expenses associated with plaintiff's right knee total knee replacement and manipulation. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendant shall pay plaintiff total disability compensation at the rate of $236.73 per week beginning October 12, 2006 and continuing until plaintiff returns to work or until further Order of the Commission. Any accrued compensation shall be paid to plaintiff in a lump sum. *Page 14 
2. Defendant shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability, including expenses associated with his right knee total knee replacement and manipulation.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel. Of the accrued amount, defendant shall pay 25% directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. Defendant shall pay the costs.
This 21st day of April, 2009.
S/_______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________________ STACI T. MEYER COMMISSIONER
 S/_______________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1